UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

LUGARD WILLIAMS,

                Plaintiff,

      - against -

BERKSHIRE FINANCIAL GROUP, INC.,
and "JOHN AND JANE DOES 1-2"
representing unknown and unidentified
employees of Berkshire Financial Group, Inc.;
FRANK V. CARONE, STACEY GOLIA,
a/k/a STACY ROSENBLATT, MIRI
ZOAREZ, RCA LAND SEARCH
INCORPORATED, and "JOHN AND JANE
DOES 3-4" representing unknown and
unidentified employees of RCA Land Search
Incorporated, RODRIGO LIRIO, ESTHER
SERRANO, B MAYER REALTY, GOSMAN
LAW, and "JOHN AND JANE DOES 5-6"
representing unknown and unidentified
employees of Gosman Law,

                Defendants.

------------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER**

CV-06-5043 (BMC) (KAM)

**COGAN, District Judge**

      This is an action under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. §2601 et seq. ("RESPA"), with additional state law claims under this Court's supplemental jurisdiction, alleging that defendants defrauded plaintiff out of the net proceeds from the sale of real property that he owned. Presently before the Court is defendants' motion to dismiss the second amended complaint (referred to below as the

"complaint") under Fed.R.Civ.P. 12(b)(6).[1] Since plaintiff's claim, at most, is a common law fraud or conversion claim that is encompassed by neither the language nor the purpose of RESPA, the motion to dismiss is granted as to the RESPA claims, and the remaining state law claims are dismissed as a matter of discretion.[2]

## BACKGROUND

The following allegations are taken from the complaint and its annexed exhibits.

Plaintiff alleges that he was the owner of a parcel of real estate that was either in or near foreclosure. Knowing of his predicament, defendant Miri Zoarez, holding herself out as an employee of both defendant Berkshire Financial Group and defendant B Mayer Realty, approached plaintiff, advising him that she would find a straw man to purchase the property and give plaintiff an option to repurchase it within two years, thus saving him from foreclosure. Plaintiff alleges that this was "a scheme that Defendants have a history of pursuing."[3]

Plaintiff was concerned about this plan and "decided not to enter into same." Instead, plaintiff found his own straw purchaser for the property, defendant Royce D'Andrade. Plaintiff submitted his name to Zoarez, who had D'Andrade fill out a

---

[1] This decision refers to defendants' motion, but in fact defendants Stacey Golia and Berkshire Financial Group have separately moved. The docket does not reflect service on any of the other defendants named in the Second Amended Complaint, and none have appeared.

[2] Defendants also purport to move to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) on the theory that since they have no liability under RESPA, the Court has no subject matter jurisdiction over that claim. That argument mischaracterizes and confuses failure to state a claim with lack of subject matter jurisdiction. See Arbaugh v. Y&H Corp., 546 U.S. 500, 126 S.Ct. 1235 (2006); Zhong v. U.S., ___ F.3d ___, 2007 WL 1574755, *1 n.2 (2d Cir. May 31, 2007) (Calabresi, J., concurring).

[3] The complaint only hints but does not explain why this "scheme" is nefarious. Certainly, a legitimate transaction could be structured to prevent foreclosure through a conveyance of the property with an option to repurchase. Or such a transaction could be a vehicle for fraud. In any event, as shown below, the complaint alleges that plaintiff did not participate in this transaction, so it does not seem to matter that defendants are alleged to have a "history" of such transactions.

2

mortgage loan application. Zoarez reported back to plaintiff that D'Andrade had qualified for a mortgage loan originated by Berkshire.

The closing of the sale from plaintiff to D'Andrade occurred several months later. Zoarez was present at the closing, as were D'Andrade and other unnamed employees of Berkshire, and perhaps others (the complaint is unclear). At the closing, plaintiff signed a HUD-1 form that defendants had prepared, and which is annexed to the complaint. It disclosed that plaintiff would be receiving $37,524.31 in net proceeds from the sale (the "Net Equity"). Plaintiff alleges that Zoarez and defendant Stacy Golia ("S. Golia") confirmed for him that he would be receiving this amount, although it is not clear if this representation was made at, during, or after the closing, as the complaint does not allege that S. Golia was present at the closing.

The HUD-1 also disclosed that B Mayer Realty would be receiving a $16,432 broker's commission (the "Brokerage Commission") even though, the complaint alleges, Zoarez was not a licensed broker. The HUD-1 also breaks out various fees and costs collected by Berkshire for originating the loan, none of which plaintiff challenges specifically.

Also at the closing, the defendants collectively produced two bank checks from Washington Mutual. The checks were in the amount of $24,405.50 and $20,027.95, respectively, both payable to plaintiff. (Plaintiff obtained copies of these checks post-commencement of this action pursuant to a subpoena served on Washington Mutual.)

The allegations concerning these checks are a paradigm of confused pleading. The checks and their stubs, copies of which are annexed to the complaint, indicate that the "remitter" of the checks was D'Andrade. The complaint, however, alleges that "the

3

funds were drawn from an account belonging to defendant Lenora Golia ... that the two checks were never negotiated ... that the funds were never withdrawn from the account, the transaction was voided, and the two checks that appeared at the closing were phony and worthless." As support for this allegation, plaintiff, in addition to annexing the checks to the complaint, cites to and annexes the transmittal letter from Washington Mutual that enclosed the checks. That letter, however, does not in any way support this allegation. It simply says that the checks payable to plaintiff were never cashed.

The complaint does not allege how it came about that plaintiff failed to walk away from the closing with these checks – since they were payable to him – and one would think he had to at least endorse them over to someone else. In any event, the complaint is clear enough that plaintiff did not get the Net Equity, or anything at all at the closing. He alleges that defendants Zoarez and S. Golia told him that he would receive it "in a couple of weeks because the moneys were currently being held in escrow to pay a utility bill," but he did not. After calling "frequently" to inquire about his money post-closing, Zoarez sent him a check for $1200, which bounced.

There are either one or two components to plaintiff's RESPA damage claim. The most essential component relates to the failure to pay him the Net Equity. The allegation in the complaint is:

> In furtherance of their scheme to defraud in direct violation of 12 USC §2607(b) whereby, no person shall accept any portion, split or percentage of charges made or received, unearned fees, kickbacks or other things of value for services not directly performed, the Defendants violated same, in that they retained the proceeds of the property that was rightfully owed to Plaintiff.

The second component relates to the Brokerage Commission. As to that, plaintiff alleges that "Zoarez personally received $16,432.00 as an unlicensed agent and entity.

Therefore, Defendants absconded with the funds in direct violation" of 12 U.S.C. §2607(b). It is not clear whether plaintiff is claiming that the payment of the Brokerage Commission itself violates RESPA, or whether the purpose of the allegation is merely to add weight to the characterization of Zoarez as a tortfeasor.

In either event, these two items together are more than the sum of their parts. In computing the amount owed to him, plaintiff not only seeks recovery of the Net Equity and the Brokerage Commission, but all of the closing costs disclosed on the HUD-1. He therefore measures his damages as the difference between the sales price, less preexisting mortgages, taxes, and judgments, which leaves a damage claim of $56,615.00.

## DISCUSSION

I. Standard Under Rule 12(b)(6)

In Bell Atlantic v. Twombly, ___ U.S. ___, 127 S.Ct. 1955 (2007), the Supreme Court rejected the oft-quoted language from Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." The Bell Atlantic Court held that:

> [A]fter puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by any set of facts consistent with the allegations of the complaint. Conley, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of pleading to govern a complaint's survival.

___ U.S. ___, 127 S.Ct. at 1969. In place of the discredited language from Conley, the Court relied on other authority holding that:

5

> While a complaint attacked on a Rule 12(b)(6) motion does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Id., 127 S.Ct. at 1959 (citations omitted). The Court summarized the applicable standard as requiring, at least, allegations "plausibly suggesting (not merely consistent with)," liability.

II. RESPA

Section 8(b) of RESPA, 12 U.S.C. §2607(b), provides that "[n]o person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." Most of the cases raising issues under this provision have addressed the practice of imposing a "yield spread premium," by which an initial or additional broker's fee is recovered by increasing the interest rate that the lender would otherwise charge, and allocating the differential between the broker and the lender. See, e.g., Schneider v. Citicorp Mortgage, Inc., 982 F.Supp. 897 (E.D.N.Y. 1997). A second frequent area of litigation is the propriety of imposing "overcharges," which are allegedly unreasonable or illegal fees to perform a service, or "markups," by which a settlement service provider pays a third party to perform the service for the provider and then charges the borrower

more than the provider's cost. See Kruse v. Wells Fargo Home Mortgage, Inc., 383 F.3d 49 (2d Cir. 2004).[4]

The instant case is not nearly as complex as those issues, for all that plaintiff has done is attempt to plead a common law fraud or conversion claim and tack on to it the language of the statute.

A. The Net Equity Claim

Section 3(3) of RESPA defines the term "settlement services" as:

> Any service provided in connection with a real estate settlement, including, but not limited to, the following: title searches, title examinations, the provision of title certificates, title insurance, services rendered by an attorney, the preparation of documents, property surveys, the rendering of credit reports or appraisals, pest and fungus inspections, services rendered by a real estate agent or broker, and the handling of the processing, and closing of settlement ... .

12 U.S.C. §2602(3).

The essence of the complaint is easily enough stated: some defendant or combination of defendants purloined plaintiff's $37,000. What is missing is any allegation that the stolen funds were "received for the rendering of a real estate settlement service," as RESPA requires. The receipt of stolen money is incompatible with the scope of RESPA, since converted funds are by definition not in payment for real estate settlement services.

---

[4] The distinction between overcharges and markups can be subtle, and many cases do not recognize it, yet as Kruse demonstrates, the distinction can be outcome determinative. Generally, a markup occurs when the settlement service provider hires a third party to provide the service, adding no value itself to the service, and then passes along to the borrower the third party's charge after increasing it by some amount. An overcharge, in contrast, is where the settlement provider performs or claims to perform the service internally, and then charges an amount that the borrower challenges as unreasonable or illegal.

The fact that defendants did provide real estate settlement services for which they were separately paid does not help plaintiff. Those charges are in no way linked to the theft of the Net Equity. Unlike any other reported RESPA case, plaintiff does not allege that defendants collected the Net Equity in payment for settlement services. Settlement services were provided, and plaintiff (or, more directly, D'Andrade, at least in the first instance) paid for them, but plaintiff does not challenge these settlement charges, either as to their reasonableness or allocation, other than claiming the charges as damages for defendants' fraud in retaining the Net Equity. The settlement service payments stand independent of defendants' misappropriation of the Net Equity.

Thus, the complaint does not allege that defendants asserted a right to retain the Net Equity in part payment for the settlement services they provided. To the contrary, the complaint implies that defendants acknowledged plaintiff's right to receive the Net Equity, alleging that, according to defendants, they were holding it temporarily pending satisfaction of a utility bill. In addition, the HUD-1 provided to plaintiff plainly shows his right to receive the Net Equity. Defendants simply failed to turn it over, thereby converting it.

RESPA does not transform every fraud or contract claim that occurs in the context of a real estate closing into a federal case. Congress declared its intent in §2(a) of the statute, stating that it seeks to protect against "unnecessarily high settlement charges caused by certain abusive practices... ." 12 U.S.C. §2601(a). Congress intended to eliminate "kickbacks or referral fees that tend to unnecessarily increase the costs of certain settlement services." Id. §2601(b)(2). There is nothing in the legislative history or language of the statute that identifies stealing equity owed to a seller as a "practice"

that the statute was meant to address.[5] "The intent of §2607(b) is to prohibit kickback and referral fee arrangements, 'not to convert every violation of a loan agreement into a violation of the Real Estate Settlement Procedures Act.'" Duggan v. Independent Mortgage Corp., 670 F. Supp. 652 (E.D. Va. 1987) (quoting Mercado v. Calumet Federal Savings & Loan Ass'n, 763 F.2d 269 (7th Cir. 1985)).

Because plaintiff's claim is so far beyond the reach of the statute, there is no directly analogous authority that has considered a similar claim. However, the Second Circuit has held that "overcharges," the practice whereby a settlement service vendor charges more than the reasonable or legal cost of the service that the vendor provides, are not actionable under RESPA. In Kruse v. Wells Fargo Home Mortgage, Inc., supra, the Court considered a practice in which the mortgage underwriter analyzed the credit risk in its mortgage applications, using software from Fannie Mae and Freddie Mac that cost $20 per use. The underwriter would then charge the mortgagor as much as twenty-five times that amount for the service, which the mortgagor challenged as "unreasonable" under RESPA. The Second Circuit assumed that the charge was "for" a settlement service, but declined to read RESPA as authorizing judicial determination of what was and was not unreasonable. In so holding, the Court rejected a HUD Policy Statement that prohibited the charging of "unreasonably" high prices for settlement services. Accord Thompson v. First Union Nat'l Bank of Delaware, No. 02-CV-215A, 2004 WL 1171738 (W.D.N.Y. Mar. 23, 2004).

---

[5] The Court need not reach defendants' argument that only buyers or mortgagors have standing under RESPA, not sellers. Although virtually all of the cases are brought by buyers or mortgagors, §2 of RESPA refers to "more effective advance disclosure to home buyers and sellers of settlement costs." 12 U.S.C. §2601(b)(1). If the structure of a transaction ultimately reduces the net amount payable to the seller, it is possible that a seller could have standing.

Similarly, in Morrisette v. Novastar Home Mortgage, No. 06-0578, 2007 WL 1186605 (S.D. Ala. Apr. 19, 2007), state law capped the allowed fee for title insurance. Plaintiff alleged that the title insurer exceeded the statutory cap in charging for its title insurance policy and thereby violated §8(b) of RESPA. The Court, relying on Kruse, rejected plaintiff's argument that the state statutory limit on title insurance fees rendered the overcharge portion a fee for "no" services: "[W]hether described as unreasonable ... or illegal, what the plaintiffs challenge is the amount of a fee charged by a provider of services that actually performed the services ... ." Id. at *2.

Judge Sifton of this Court extended Kruse to the "no services" situation in Cohen v. JP Morgan Chase and Co., No. CV-04-4098, 2006 WL 205596 (E.D.N.Y. Jan. 4, 2006). There, the closing statement showed a $225 "post-closing fee." It was not until after the closing that plaintiff learned that the purpose of the fee was to offset costs that the lender would later incur in repackaging the loan for sale in the secondary market. She therefore contended that she had received no services at all for this fee, and that it constituted a charge "other than for services actually performed." The Court declined to distinguish that claim from the "overcharge" claim rejected in Kruse: "An overcharge is a lender's provision of services to a borrower at an unreasonably high price. ... [A]ssuming Cohen was charged a fee for which no services were performed, such fee was a quintessential overcharge." Id. at *2.

These cases collectively demonstrate the courts' recognition that Congress did not intend to turn federal courts into roving equity tribunals over real estate closings when it enacted RESPA. Moreover, comparison of the instant case with the authorities discussed above make it apparent that plaintiff's claim is even less cognizable under RESPA. If an

"overcharge," which has a direct connection to a settlement service, is not within RESPA, it seems clear that neither is outright thievery. Unlike the cases discussed above, we need not reach the question of whether defendants' theft of the Net Equity was "other than for services actually performed," because plaintiff's claim fails before it ever reaches this final qualifying clause. A theft is not a "settlement service;" no more is it a "charge" that is imposed for rendering such a service.

Because Congress sought to remedy particular abusive practices that it found prevalent, RESPA presupposes that any payment of funds to a settlement service provider will be under a claim of right by that service provider. RESPA merely limits those claims of right. That is not plaintiff's case here. Plaintiff does not quarrel with the quantum or type of charges that these defendants imposed, but only that they utilized the opportunity of participating in the transaction to walk off with his Net Equity.

There is nothing in the language or legislative history of the statute to suggest that the mere opportunity to steal that might arise by participating in a real estate financing was Congress' target. The complaint thus violates the pleading standard set forth in Bell Atlantic by taking at most an ordinary common law claim and applying the "labels and conclusions" of RESPA to it. RESPA does not federalize a fraud claim simply because it touches upon a real estate closing. Accordingly, plaintiff's claim for the Net Equity fails.

B. The Brokerage Commission

As noted above, it is not clear whether plaintiff challenges the payment of the Brokerage Commission under RESPA or merely pleads it as additional evidence of Zoarez' wrongful conduct. In either event, it is, at most, a state law claim, and it also fails under the statute.

The Second Circuit, in contrast to most other circuits, has held that the "give *and* ... accept" (emphasis added) language of §8(b) does not require two miscreants, despite its use of the conjunctive "and." In Kruse, the plaintiffs challenged both overcharges and markups. As to the markups, defendants asserted that the statute required that one violator "give" a portion of the markup to another violator – the "acceptor". They urged that it made no sense to consider the consumer to be the giver, because if he was, then he would be engaging in prohibited conduct as well as the acceptor. The Second Circuit, rejecting this argument, deferred to an interpretive HUD regulation which provided that the consumer should indeed be considered the "giver" under the statute, despite the fact that he was not violating it by paying the fee.

Even assuming, however, that plaintiff is the "giver" and Zoarez is the "acceptor," Kruse did not suggest that the phrase "portion, split, or percentage of any charge" could be read out of the statute. In markup cases like Kruse, the settlement service provider pays its outside vendor the vendor's charge for performing the service; the settlement service provider simply adds on to that charge and passes the total amount through to the borrower as a single line item. For example, a courier service that is not a party to the closing but still assists a mortgage lender by delivering documents is neither a "giver" nor an "acceptor" because it does not provide a real estate settlement service. But the mortgage lender that hires the courier service receives a "portion, split or percentage" of the charge that shows up on the HUD-1 because it has to pay the courier whatever the courier is charging. In that situation, there are two steps. First, under Kruse, the borrower is the "giver," and the mortgage lender is the "acceptor." Second, because the mortgage lender has split its payment with the courier, it falls within the reach of the statute. Only

one party has engaged in wrongful conduct under the statute – the mortgage lender – but because there is a giver (the borrower), an acceptor (the mortgage lender), and a split fee with a third party (the courier), RESPA applies.

In the instant case, the "portion, split or percentage" language in §8(b) forecloses plaintiff's claim to recover the Brokerage Commission, for there is no allegation in the complaint that anyone other than Zoarez received it and kept it. To the contrary, the complaint alleges that she "personally received" it even though her employer, B Mayer Realty, is listed on the HUD-1. It does not allege that she apportioned or divided it with anyone after receiving it. There is thus no "portion, split or percentage" as to that fee.

The cases interpreting RESPA support the conclusion that retention of the entire charge by a single party is outside the statute. See Morrisette, supra, at *2 ("[t]he trouble is that ... the provider of services ... did not split the fee with any person or entity"); Cohen, supra, at *2 ("RESPA clearly contemplates the existence of a third-party with whom the charges have been split"); Welch v. Centex Home Equity Co., LLC, 262 F. Supp. 2d 1263 (D. Kan. 2003) (where mortgage originator defrauded plaintiff into entering mortgage but did not share fees, no action under RESPA).

Plaintiff's challenge to the propriety of the Brokerage Fee has nothing to do with the language or purpose of RESPA. In essence, plaintiff is alleging that the Brokerage Fee is improper because Zoarez is not a licensed broker. That may or may not be a state law violation, but it does not fall under RESPA because Zoarez, according to the complaint, kept it all.[6]

---

[6] Even if Zoarez shared the Brokerage Commission with B Mayer Realty, which the complaint does not allege, this would not be fee splitting under the statute, as an employee is not deemed to "share" a fee with

III. Leave to Amend

Plaintiff has not requested leave to amend, and I decline to grant it *sua sponte* as a matter of discretion for several reasons. First, plaintiff has already filed three complaints, and the third is no closer to the first in stating a claim under RESPA upon which relief could be granted. This is telling considering that the Court convened two premotion conferences on prior versions of the complaint, in which the issues were discussed at length. Second, plaintiff has made virtually no effort to defend his pleading of the RESPA claim in opposition to defendants' motion. The substance of his brief on that point consists of two paragraphs, neither of which cite the statute, nor any case law under it. The brief point does no more than the complaint does, i.e., recite the facts and conclusorily assert that RESPA applies. Finally, and most importantly, the facts that plaintiff has pled are inconsistent with a claim under RESPA for the reasons stated above, so that the complaint's deficiencies are not subject to cure. See Porat v. Lincoln Towers Community Ass'n, 464 F.3d 274 (2d Cir. 2006) (district court has discretion to deny leave to amend even if plaintiff requests it if plaintiff offers no means to cure defective pleading); Lucente v. International Business Machines Corp., 310 F.3d 243, 258 (2d Cir. 2002) ("[w]here it appears that granting leave to amend is unlikely to be productive [due to futility] ... it is not an abuse of discretion to deny leave to amend") (quoting Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir.1993)).

---

her employer for purposes of RESPA. See Wydler v. Bank of America, N.A., 360 F. Supp. 1302 (S.D. Fla. 2005) (sister corporations – mortgage lender and servicer – could not be deemed to have "shared" a fee because they were in the same corporate family; unless a referral relationship exists, claim for fee splitting does not fall under RESPA).

IV. State Law Claims

The decision whether to exercise supplemental jurisdiction is within the discretion of the district court. See Tops Market, Inc. V. Quality Markets, Inc., 142 F.3d 90 (2d Cir.1998); Purgess v. Sharrock, 33 F.3d 134, 138 (2d Cir.1994). In doing so, the district court should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness and comity." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988); United Mine Workers v. Gibbs, 383 U.S. 715, 726-27 (1966)). One of the grounds for declining supplemental jurisdiction, specifically listed in 28 U.S.C. §1367, is where the district court has dismissed the claims over which it has original jurisdiction. The Second Circuit has indicated that generally, "if federal claims are dismissed before trial ... the state claims should be dismissed as well." Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir.1991).

This case has not progressed beyond the pleading stage. No discovery has been taken. The parties have no investment in this Court beyond the instant motions. The claims remaining are entirely state statutory and common law claims. I therefore decline to exercise supplemental jurisdiction over plaintiff's state law claims.

## CONCLUSION

Plaintiff's claims under RESPA are dismissed with prejudice. His state law claims are dismissed without prejudice. The Clerk is directed to close the file.

**SO ORDERED.**

/s/((BMC)
U.S.D.J

Dated: Brooklyn, New York
June 11, 2007